Charles W. GRANT, Ronald Bergwerk,
Plaintiffs–Appellants,

v.

GEORGE SCHUMANN TIRE &
BATTERY COMPANY,
Defendant–Appellee.

No. 89–3615.

United States Court of Appeals,
Eleventh Circuit.

Aug. 10, 1990.

See also 106 B.R. 296.

Ronald Bergwerk, Jacksonville, Fla., for plaintiffs-appellants.

Albert Mickler, Jacksonville, Fla., for defendant-appellee.

Before JOHNSON, Circuit Judge, and HILL * and HENLEY **, Senior Circuit Judges.

JOHNSON, Circuit Judge:

Charles W. Grant, the appointed trustee in this seven-year-old involuntary bankruptcy proceeding, and Ronald Bergwerk, his attorney, appeal from the district court's affirmance of the bankruptcy court's award of $35,725.88 in attorney's fees to Bergwerk. They also appeal the district court's affirmance of the bankruptcy court's award to the debtor, George Schumann Tire & Battery Co., of interest on $275,088 required to be refunded to the debtor by the trustee.

## I. STATEMENT OF THE CASE

Schumann Tire & Battery Co. is a retail tire business; H. Harold Hart is an officer and principal stockholder in the business.[1]

---

* See Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Hon. J. Smith Henley, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

1. Although Schumann Tire went through bank-

The business had accumulated several judgments from personal injuries and unpaid debts. When creditors attempted to obtain payment of these debts, Hart told them that Schumann Tire had ceased to exist as of June 1982 and that there was no money available. According to Grant, this was because Hart transferred Schumann Tire to Bostick Oil Company in order to become judgment-proof.[2] On March 1, 1983, some of the creditors filed involuntary bankruptcy petitions under chapter 7 of the bankruptcy code. The bankruptcy court ("Bankruptcy I") ordered relief effective May 2, 1983, and set January 20, 1984 as the last date for creditors to file proof of claims. The creditors filed twenty claims totalling approximately $840,000.

Rather than contesting the involuntary petitions, the debtor filed schedules claiming that it had no assets. Foreseeing the need for legal action, Grant (himself an attorney) hired an attorney, Ronald Bergwerk, on May 20, 1983.[3] Bergwerk began to investigate the debtor's claim that it had no funds, and concluded that the debtor fraudulently transferred its assets to Hart Enterprises and Bostick Oil.[4] Grant thus brought a five-count claim against the debtor before Bankruptcy I. Bankruptcy I held a two-day trial. Grant prevailed on one count, and Hart and Hart Enterprises were ordered to pay a $346,000 judgment in favor of the trustee. Bergwerk and Grant further funded the bankruptcy estate by means of an interpleader action with Bostick Oil, discussed *infra*, and garnishment of Hart's Merrill Lynch assets.

Rather than paying the $346,000 amount into the bankruptcy estate, Hart eventually paid all but three of the creditors directly. The three remaining claims totalled $644,080.86. One of the three claims was filed by Hart himself for $633,000, based on a judgment against the debtor. On November 27, 1985, however, the bankruptcy court allowed only $93,000 of this claim, at which point the estate became solvent. The trustee paid $11,080 to the remaining two creditors and concluded administration of the estate. Because Grant and Bergwerk had brought over $400,000 into the estate a large amount of money remained undistributed at the estate's conclusion. On August 4, 1986, the bankruptcy court ordered a refund to the debtor of $275,088.96, the amount remaining in the estate after the creditors and administrative expenses were paid. For two years Grant failed to transfer this amount to the debtor. On September 22, 1988, after a second court order, Grant attempted to refund $299,749.22 to the debtor, but the debtor refused the offer.

Besides the fraudulent transfer action, Bergwerk represented Grant in two other proceedings. Grant brought one suit to recover possession of nine vehicles, some of which were titled in the debtor; this proceeding took approximately one hour to resolve, and the bankruptcy court granted relief. The second action was the Bostick Oil interpleader. Bostick entered into the allegedly fraudulent purchase and sale agreement with Hart and Hart Enterprises on March 31, 1983, and made a large down payment at that time. When the creditors filed under chapter 7, twenty monthly payments of $7,987.78 each remained due on the two promissory notes owed by Bostick to Hart. Because of the fraud claim, there was some dispute between Grant and Hart regarding whether the money remaining on the notes was subject to bankruptcy proceedings. Bostick interpleaded the funds into the court registry on October 13, 1983, asking the court to resolve the ownership

ruptcy proceedings, presently it is active and solvent.

**2.** Hart transferred the inventory, name, and goodwill of Schumann Tire to another company owned by him, Hart Enterprises. He then sold the Schumann Tire equipment to Bostick Oil Company, and Hart Enterprises sold the inventory, name, and goodwill of Schumann Tire to Bostick Oil Company.

**3.** Section 327(a) of the Bankruptcy Code allows a trustee to employ an attorney based on reasonable terms and conditions. *See In re Port Royal Land & Timber Co.*, 105 B.R. 72, 74 (Bkr. S.D.Ala.1989).

**4.** An attempt to settle this issue apparently brought hostilities to the surface. Hart threatened that if Grant continued to force the fraudulent transfer issue, the debtor would sue.

issue. On April 24, 1984, pursuant to a stipulation reached by Hart, Grant, and Bostick Oil, Grant transferred the funds to an interest-bearing account, and Bostick made all payments to Grant for placement in the account until resolution of the action. On September 19, 1985, Bankruptcy I granted summary judgment in favor of Grant and ordered Bostick to pay the balance of the notes to Grant.

Bergwerk requested $103,200 in attorney's fees plus expenses on August 5, 1985, and amended his application to request $138,400 plus expenses on December 22, 1985. A hearing was held before Bankruptcy I on July 31, 1986. The main issue at this hearing was the fee to be paid to Bergwerk. Expert witnesses recommended fees ranging up to $160,000. The debtor suggested a fee of $43,200 to $57,-600. Bankruptcy I awarded $35,725.88. This amount represented five percent of the total estate plus a $15,000 bonus. The court used this percentage basis rather than a lodestar rate because it concluded that Bergwerk had spent more hours on the case than were necessary. The debtor appealed the award;[5] Bergwerk filed a cross-appeal. On December 7, 1987, the district court vacated the fee award and remanded for a *de novo* determination of attorney's fees and an explanation of those fees. Bankruptcy I set a date for a new fee hearing and a hearing on the debtor's motion for payment of its refund, which Grant had not yet tendered. The first bankruptcy judge recused himself, however,[6] and a second fee hearing was scheduled for July 25, 1988. Expert witnesses at the second hearing recommended fees

ranging from $17,000 to $171,000. The second bankruptcy court ("Bankruptcy II") again awarded a fee of $35,725.88, 89 B.R. 223. Bankruptcy II also directed Grant to pay the debtor its refund.

The debtor filed a motion for rehearing, demanding interest on the amount of the delayed refund. Bankruptcy II awarded $65,116.76 in interest on September 8, 1988, ordering Grant to pay a total refund of $340,205.92. Bergwerk appealed the fee award and Grant appealed the award of interest. The district court conducted a *de novo* review of the record and affirmed the attorney's fee award. It did not discuss the interest issue. Grant and Bergwerk appeal from the district court's ruling.[7]

We must determine whether Bankruptcy II abused its discretion in determining the appropriate initial fee award for Bergwerk, whether the district court erred in failing to direct the award of attorney's fees to Bergwerk for his defense of the debtor's appeal of the original fee award, and whether the bankruptcy court erred in charging Grant interest on the delayed refund.

## II. ANALYSIS

### A. *The Initial Fee Award*

■■■ In determining attorney's fees, a judge must 1) determine the nature and extent of the services rendered; 2) determine the value of those services; and 3) consider the factors laid out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d

---

5. The record sheds no light on the question of why the debtor would appeal a fee award that was *less* than the amount that it recommended.

6. The debtor made a motion for recusal. The motion alleged that the judge's brother had represented an adverse party some years past and had pressured the judge to enter orders adverse to the debtor's interests. The motion also alleged that the judge would not be impartial because he had suggested at earlier hearings that Hart was proving to be an obstacle to the trustee's administration of the estate. The judge recused himself in response to the motion. Grant and Bergwerk claim that the debtor made this motion because it did not want the fee

hearing to be conducted before the judge who had witnessed its "vexatious conduct" over the preceding years.

7. There were two motions carried with this appeal. Grant and Bergwerk requested leave to file an appendix to the brief. The debtor responded with a motion to strike. The motion to file an appendix was granted at oral argument, and the motion to strike was denied. The debtor has also filed a motion for an award of attorney's fees for services rendered on this appeal, claiming that the appeal is frivolous and repetitive. We deny this motion for the reasons explained later in the opinion.

714 (5th Cir.1974) [8] and explain how they affect the award.[9] *Matter of First Colonial Corp. of America*, 544 F.2d 1291, 1299–1300 (5th Cir.), *cert. denied sub nom., Baddock v. American Benefit Life Ins. Co.*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977). In the bankruptcy context, the judge must also consider whether the bankruptcy assets were administered as economically as possible and whether any of the services rendered were duplicative or non-legal. *Matter of U.S. Golf Corp.*, 639 F.2d 1197, 1201 (5th Cir.1981). Bankruptcy judges and district courts have broad discretion in determining attorney's fees for bankruptcy proceedings; the exercise of that discretion will not be disturbed absent abuse of discretion. *Matter of First Colonial*, 544 F.2d at 1298. Bankruptcy and district court judges may abuse their discretion by failing to apply proper legal standards, by failing to follow proper procedures, or by basing the award on findings of fact that are clearly erroneous. *Id.*

■ Bergwerk's main argument is that Bankruptcy II miscalculated his fee award,

denying him fees to which he was entitled.[10] He argues that Bankruptcy II used an incorrect lodestar base rate and erroneously failed to use an enhancement multiplier when calculating the award.

### (1) Lodestar

■ Section 330(a)(1) of the Bankruptcy Code authorizes the bankruptcy court to award "reasonable compensation for actual, necessary services rendered by ... any paraprofessional persons employed by [the] trustee ... based on the nature, the extent, and the value of such services, the time spent on such services and the cost of comparable services *other than in a case under this title....*" (emphasis added). Thus, Congress expressed its intent that there should be no distinction between fees set in bankruptcy cases and those set in non-bankruptcy cases. *Matter of Bar-B-Que Management Associates, Inc.*, 82 B.R. 152, 154 (Bkr.M.D.Fla.1988). Attorney's fees in bankruptcy cases should be no less,

**8.** Fifth Circuit decisions issued before the close of business on October 1, 1981, constitute binding precedent for this Court. *Bonner v. City of Prichard,* 661 F.2d 1206, 1210 (11th Cir.1981).

**9.** The twelve factors listed in *Johnson* are as follows: (1) the time and labor required, (2) the novelty and difficulty of the legal questions, (3) the skill required to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee for similar work in the community, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorney, (10) the undesirability of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. *Johnson,* 488 F.2d at 717–719.

**10.** Bergwerk raises several other issues which are clearly meritless. He first argues that on remand, Bankruptcy II did not make specific findings under each of the *Johnson* factors. A court's order on attorney's fees only need be specific enough to allow meaningful review; the court must "articulate the decisions it made, give principled reasons for those decisions, and show its calculation." *Norman v. Housing Authority of City of Montgomery,* 836 F.2d 1292, 1304 (11th Cir.1988). Although Bankruptcy II

did not state explicitly which of the various findings in its twenty page opinion was made pursuant to which *Johnson* factor, it is clear that the court considered those factors. Second, Bergwerk challenges Bankruptcy II's finding that the time sheets Bergwerk submitted "[d]id not represent a contemporaneous recordation of the events as they occurred, but represent[ed] only an attempt by Mr. Bergwerk to reconstruct from memory and from some records [the time expended]." The court awarded Bergwerk $4000 over the amount resulting from multiplying his hourly fee by the number of hours he claimed to have worked, so there is no evidence that Bankruptcy II penalized Bergwerk for reconstructing his hours. Further, Bergwerk admits that he did not submit time sheets until almost four years after the fact, and a court has discretion to determine the credibility of hours claimed in the absence of contemporaneous records. *Johnson v. University Col. of Univ. of Ala. in Birmingham,* 706 F.2d 1205, 1207 (11th Cir.1983), *cert. denied,* 464 U.S. 994, 104 S.Ct. 489, 78 L.Ed.2d 684, *modified in other part, Gaines v. Dougherty County Bd. of Educ.,* 775 F.2d 1565 (11th Cir.1985). Third, Bergwerk claims that Bankruptcy II erred in accepting the recommendation of one expert regarding attorneys fees over that of others who testified. Aside from the fact that Bankruptcy II never indicated which expert it relied on, this Court has held that expert testimony is not required at all on the attorney's fees issue. *Matter of U.S. Golf Corp.,* 639 F.2d at 1202.

and *no more,* than fees received for comparable non-bankruptcy work. *In re Manoa Finance Co.,* 853 F.2d 687, 690 (9th Cir. 1988).

In an ordinary attorney's fee case, the court arrives at a fee by multiplying the attorney's reasonable hourly rate by the number of hours reasonably expended. *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983).[11] A calculation of the reasonableness of the rates and hours usually involves consideration of the twelve *Johnson* factors. *Id.* at 434 n. 9, 103 S.Ct. at 1940 n. 9. Bankruptcy II asked Bergwerk to state his regular hourly rate. Bergwerk replied that he charged approximately $125 per hour. The court concluded that multiplying $125 by the 253.8 hours that Bergwerk claimed to have worked was sufficient to calculate the fee. The court refused to grant a fee in excess of that awarded by Bankruptcy I (which itself included $9,963.38 more than the lodestar calculation).

Bergwerk argues that the $125 per hour rate was unreasonably low. He argues that the court should have based its calculation on the awards given in comparable cases, citing the twelfth *Johnson* factor. He points to other bankruptcy cases where trustees' attorneys received anywhere from $111,400 for 31.6 hours of work, or thirty percent of the total recovery, *Matter of Bar–B–Que,* 82 B.R. at 154, to $1.4 million for 5,693 hours of work, calculated using a 1.7 multiplier, *Matter of Lawler (Lawler v. Teofan),* 807 F.2d 1207 (5th Cir.1987). Bergwerk also claims that in the present case Grant received $200 per hour for his work,[12] and the attorney for Bostick Oil received $2,710 for merely filing the interpleader.

It is true that the bankruptcy court refused to consider comparable awards in other cases. Each *Johnson* factor, however, must be considered in light of the other factors, and "a genuine balance must be struck by the bankruptcy judge." *Matter of U.S. Golf Corp.,* 639 F.2d at 1205. Bankruptcy II's combined conclusions regarding the eleven other *Johnson* factors indicate that its failure to consider similar case awards was not an abuse of discretion.[13] Further, while some courts have held that "[t]he term 'cost of comparable services' does not mean the usual hourly billing rate of the applicant," but refers to the fee customarily charged in the local community, *In re Shades of Beauty,* 56 B.R. 946, 951 (Bkr.E.D.N.Y.1986), *aff'd in*

**11.** Although it has been recognized that the lodestar approach may be problematic in bankruptcy cases where the attorneys may expend hours for which there is no accurate measure of success or failure, the approach remains applicable in the bankruptcy context. *See In re Port Royal Land & Timber Co.,* 105 B.R. at 77–78.

**12.** Aside from his statutory trustee's allowance, Grant received only $1,800 in attorney's fees for his work on the *Schumann Tire* case, approximately half the amount Bergwerk received.

**13.** (1) With regard to the time and labor required, Bankruptcy II indicted that it was suspicious of the 253.8 hours Bergwerk claimed to have worked, because Bergwerk did not record the hours at the time they were expended. It also indicated that it found some of the work, particularly the garnishment of Hart's Merrill Lynch account, to be unnecessary. (2) Regarding the novelty and difficulty of the questions, Bankruptcy II stated that Bergwerk had been involved in only three proceedings, one of which did not go to trial. The fraud trial lasted only two days, and Bergwerk was successful on only one issue. The turnover proceeding took only one hour to resolve and only nine hours of work on Bergwerk's part, and the interpleader action took only fourteen hours of work. (3) Regarding the skill required, the previous discussion indicates that Bankruptcy II found that little skill was required of Bergwerk. (4) Bergwerk admitted that the Schumann Tire action did not specifically preclude him from taking other employment. (5) As discussed *supra,* the court found that Bergwerk's customary fee was $125 per hour. (6) Regarding whether the fee was contingent, the court found that any risk of non-payment evaporated when the Bostick Oil interpleader question was resolved. (7) Bergwerk concedes that time limitations were of no significance. (8) The bankruptcy court found that the result obtained was not outstanding, because most of the money collected went back to the debtor, from whom it came. (9) The court stated that reputation or ability of representation was represented by the reasonable hourly rate. (10) The undesirability of the case is connected with the risk of non-payment, which Bankruptcy II concluded was minimal. (11) Regarding the nature and length of the relationship, Bergwerk represented Grant in only three matters, one of which never went to trial.

*part, remanded in part,* 95 B.R. 17 (E.D. N.Y.1988), others have held that an hourly rate in excess of the applicant's hourly rate is too high. *Southwestern Media, Inc. v. Rau,* 708 F.2d 419, 428 (9th Cir.1983). In either case, the aim is uniformity and economy, not attorney gain. *In re Shades,* 56 B.R. at 951.

#### (2) Enhancement

Lodestar rates may be enhanced based on risk of non-recovery, excellent or exceptional results, or delay in receipt of payment. *Norman,* 836 F.2d at 1302. Bergwerk first argues that his fee should have been enhanced because of the risk that he wouldn't recover a fee. Bankruptcy II refused such an enhancement, based on the reasoning in *Pennsylvania v. Delaware Valley Citizens' Council for Clear Air (Delaware Valley II),* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987), in which the Supreme Court refused to increase a lodestar fee based on the risk that the attorney might not prevail. *Id.,* 107 S.Ct. at 3086. Bergwerk claims that the court's reliance on *Delaware Valley II* is misplaced because the Supreme Court made that decision in the context of the Clean Air Act, which is a fee-shifting statute. Bergwerk argues that section 330 of the Bankruptcy Code is not a fee-shifting statute, and thus that contingency must be considered in bankruptcy cases.

■ We need not decide this question. Even if enhancement principles do apply to no-asset bankruptcy cases, Bankruptcy II did not err in refusing to enhance Bergwerk's fee for risk. A court may enhance the fee if there is a risk of non-recovery and if counsel shows that "such enhancement is necessary to assure the availability of counsel." *Norman,* 836 F.2d at 1302. Bergwerk has produced no proof that enhancement was needed to ensure availability of counsel. Further, once the estate receives assets, the trustees and other administrative personnel are guaranteed

some payment, because 11 U.S.C.A. § 726, through 11 U.S.C.A. § 507, gives administrative expenses top priority in estate distribution. Although the estate had no assets at the inception of the proceedings, Bergwerk worked for an asset-less estate for only seven months;[14] the $15,000 bonus added to the first fee award and the $4000 enhancement on the second may have been added by the bankruptcy courts to cover this. Bankruptcy II did not err in refusing to enhance the award based on risk.

■ Bergwerk argues that his fee should have been enhanced because the results he achieved were extraordinary. "Exceptional results are results that are out of the ordinary, unusual or rare." *Norman,* 836 F.2d at 1302 (citing *Pennsylvania v. Delaware Valley Citizens' Council,* 478 U.S. 546, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986)). Even exceptional results do not warrant enhancement "unless there is specific evidence in the record to show that the quality of representation was superior to that which one would reasonably expect in light of the rules claimed." *Id.*

Bankruptcy II did not find Bergwerk's results to be impressive. The majority of the estate was funded when Hart paid off a large number of the creditors himself, when Bostick agreed to pay to the trustee the money it owed Hart from the purchase of assets, and when Bergwerk garnished $217,829 in Hart's Merrill Lynch holdings on November 13, 1985. According to Grant's final report, the total amount realized by these and other transactions was $414,570.67. Of that amount, $93,100.25 went to Hart for his claim against the debtor and $275,088.96 was a refund to the debtor itself. Thus, eighty-eight percent of the money collected went to Hart, either individually or as principal stockholder in the debtor.[15] Because Hart was the source of the funds to begin with, Bankruptcy II concluded that the majority of the funds collected by the trustee and Bergwerk sim-

---

14. Bergwerk was hired May 18, 1983. The record indicates that the trustee began receiving funds on December 20, 1983.

15. Hart owned 75% of the debtor's stock. Bergwerk himself admits that Hart is the debtor's principal.

ply went back to their source. Only 2.6% of the funds generated by Bergwerk's work went to unsecured creditors.[16]

Further, Bergwerk has produced no evidence that the results he achieved were extraordinary or that his representation was superior. Although Bergwerk represented Grant in three proceedings, the work he actually performed was not excessive or difficult. Only two of the three actions went to trial. In the vehicle possession proceeding, Bergwerk performed one hour of work to obtain possession of vehicles already titled in the debtor. In the fraudulent transfer action, Bergwerk lost on four of the five claims he asserted.[17] In the interpleader action, Bostick conceded that it owed money and agreed to pay the balance to Grant. Bankruptcy II did not err in failing to enhance the fee for extraordinary results.

### (3) Factual Conclusions

Bergwerk challenges several of Bankruptcy II's factual findings; only one of these challenges has merit.[18] Bankruptcy II concluded that when Bankruptcy I ordered Bostick to pay the interpleader funds to Grant on September 19, 1985, the estate acquired enough money to pay the unsecured creditors. Thus Bergwerk's garnishment of Hart's Merrill Lynch accounts on November 13, 1985 amounted to Bergwerk's taking from Hart to pay Hart's claim. Bergwerk claims that the court's conclusion that his efforts to garnish Hart's estate were unnecessary and self-serving is clearly erroneous. Bergwerk claims that in August 1984, the trustee had only $1,069.79 and claims outstanding totalled $838,188.11.

According to Grant's own final report, as of August 15, 1984 the trustee had receipts totalling $91,668.89. The bar date for creditors' claims was seven months past, so all claims had been filed. Only $70,005.84 of the claims filed as of August 15, 1984 were from unsecured creditors other than Hart. The debtor argues that Bergwerk knew there was enough money in the estate to pay everyone but Hart, so that garnishing Hart's assets was unnecessary.

Bergwerk responds that this conclusion is erroneous because until Hart's $633,000 claim was disallowed, the estate's obligation to Hart was no different than its obligations to the unsecured creditors. This contention is true. As long as Hart's claim was allowed, the trustee had a duty to Hart equal to that owed the other creditors. This erroneous finding, however, does not constitute reversible error. Even without the court's conclusion that the garnishment was unnecessary, Bergwerk's collection of a $414,517.67 estate to pay a $104,080 claim does not constitute an extraordinary result, especially when almost ninety percent of the money collected went back to its source. Further, while garnishment may have been prudent on November

---

**16.** By comparison, Bergwerk's fee represents 8.6% of the funds generated.

**17.** Bergwerk correctly points out that a court may not reduce proportionately a lodestar recovery based simply on "a mathematical approach comparing the total number of issues in the case with those actually prevailed on." *Popham v. City of Kennesaw*, 820 F.2d 1570, 1579 (11th Cir.1987) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 435 n. 11, 103 S.Ct. 1933, 1940 n. 11, 76 L.Ed.2d 40 (1983). In the present case, however, the court did not reduce the lodestar, but refused to enhance it. Further, the court did not base its entire fee decision on the mathematical calculation, but considered the calculation as one of several factors mitigating against enhancement.

**18.** Bergwerk's other factual challenges are meritless. Bergwerk challenges the court's conclusion that Hart was the sole principal of the debtor, attempting to counter the conclusion that any money going to or coming from Schumann Tire actually went to or came from Hart. He claims that in fact Hart owned only seventy-five percent of the Schumann Tire stock. The court did not err in concluding that a seventy-five percent shareholder constituted sole principal of the debtor corporation.

Bergwerk also challenges the court's finding that he should have known that the debtor held title to several of the contested vehicles before filing the turnover complaint. Bergwerk agrees that he knew this fact, but argues that the proceeding was difficult nonetheless because the debtor and Bostick refused to turn over the vehicles. This contention is trivial at best; the bankruptcy court's point was that the disposal of the matter took only an hour and required little work on Bergwerk's part.

13, 1985, Hart's claim was disallowed on November 25, 1985. The garnishment proceeds were not received by the estate until December 11, 1985, two weeks after the court disallowed Hart's claim and it became clear that garnishment was no longer necessary. Yet Bergwerk made no attempt during that two-week period to halt the garnishment proceedings. He allowed the money to be processed through the estate, turning a $196,741.67 estate into a $414,570.67 estate. The district court did not err in concluding that this action was unnecessary and self-serving.

## B. Fee for the Defense of the Debtor's Appeal

On remand from the original fee award, Bergwerk requested fees for twenty-nine hours of work expended in defending the debtor's appeal of his original fee award. Bankruptcy II questioned this claim because it perceived that Bergwerk was not the prevailing party on that appeal. The court came to this conclusion because Bergwerk's original fee award was vacated on appeal. Bergwerk disagrees. He argues that, although the fee award was vacated on appeal, it was reinstated by Bankruptcy II on remand. Therefore, Bergwerk argues, his defense of the appeal was successful and he should be awarded fees for that defense.[19]

As an initial matter, it appears that Bergwerk was awarded fees for his defense of the appeal.[20] There is no evidence that Bankruptcy II failed to award fees for the defense of the appeal, except the court's observation that it did not consider Bergwerk to have prevailed. Nowhere does the court state that it refused to compensate Bergwerk for the time spent defending the appeal. Further, Bergwerk was not entitled to remuneration under section 330 for defending the appeal.[21] As discussed *supra*, section 330 is "not the 'usual' sort [of fee-shifting statute] contemplated by *Delaware Valley II." Matter of Baldwin–United Corp.*, 79 B.R. 321, 346 (Bkr.S.D. Ohio 1987). There is no prevailing party provision in section 330. *In re Manoa*, 853 F.2d at 691. "The concept of a prevailing party in bankruptcy cases is ... incongruous. While a debtor or creditor may prevail in one or more of the many disputes which arise in the course of a typical Chapter 11 reorganization, almost everyone loses something." *Id.* The language of section 330 does not authorize the court to award attorney's fees to the prevailing party. Rather, the statute authorizes the court to award "reasonable compensation for ·actual, necessary services rendered...." 11 U.S.C.A. § 330(a)(1).

■ In considering Bergwerk's claim for fees generated on defense of the appeal and presentation of the cross-appeal, then, the issue is not whether Bergwerk was the prevailing party. Rather, the issue is whether the services rendered were reasonable and necessary to the administration of the estate. *In re Temple Retirement Community, Inc.*, 97 B.R. 333, 338 (Bkr.W. D.Tex.1989). The answer to this question is no. The subject of the debtor's appeal and of Bergwerk's cross-appeal was the fee to be paid to Bergwerk for his services rendered in the administration of the estate. The appeals brought absolutely no

---

19. Bergwerk also asks this Court to grant fees for his district court appeal of the Bankruptcy II fee award and his appeal to this Court. For the reasons discussed *infra*, we deny this application.

20. In his fee application before Bankruptcy II, Bergwerk claimed to have worked a total of 253.8 hours on the case; that total included a claim for 29 hours spent working on the appeal and 18.7 hours on the remand. Multiplying 253.8 hours by Bergwerk's hourly rate of $125 yields a lodestar figure of only $31,725.00, $4,000 less than what Bergwerk was actually awarded.

21. The two civil rights cases which Bergwerk points to in support of his claim, *Riddell v. National Democratic Party*, 624 F.2d 539 (5th Cir.1980), and *Knighton v. Watkins*, 616 F.2d 795 (5th Cir.1980), are inapplicable. Unlike section 330, 42 U.S.C.A. § 1988 is a specific fee shifting statute. Neither is *Bustamante v. First Federal Savings and Loan Ass'n*, 619 F.2d 360 (5th Cir.1980) persuasive. Although the *Bustamante* court ordered that the fee award include fees accrued on appeal, the issues appealed in that non-bankruptcy case included the right of recision under 15 U.S.C.A. § 1635(a), not the attorney's fee issue alone.

benefit to the estate, the creditors, or the debtor. *See In re Wildman*, 72 B.R. 700, 731 (Bkr.N.D.Ill.1987) (disallowing law firm's claim for fees generated working on motion for reconsideration because the work "was not rendered on behalf of the estate"). The estate had been resolved since December 1985, and Bergwerk's services were complete. If Bankruptcy II erred in calculating Bergwerk's fee, it erred by "paying" him for services rendered to himself and not to the estate.

## C. *Interest on the Delayed Refund*

■ On August 4, 1986, Bankruptcy I ordered Grant to refund the remaining $275,088.96 in the estate to the debtor. By the time of the second fee hearing before Bankruptcy II, Grant had not made the refund. At the second fee hearing, Bankruptcy II asked Grant why he had not made the refund. Grant stated that Bergwerk told him not to make the refund because Bergwerk was appealing his fee award and if Bergwerk won his appeal and was granted a larger fee, there would be less money available for a refund.[22] Bankruptcy II ordered Grant to make the refund and ordered him to pay $65,116.76 interest on the amount from the time of the original refund order. The district court affirmed the award of interest. Grant argues that the interest award was not warranted by statute.

Both Grant and the debtor assume that Bankruptcy II intended the interest as a punitive measure against Grant. They assume that the court intended the interest money to come from Grant's pocket to punish Grant for his delay in returning the refund. If this is indeed what Bankruptcy II intended, the award of interest was invalid for two reasons. First, there is no law supporting such a punitive award under the present circumstances. Title 11 U.S.C.A. § 726(a)(5) provides for the pay-

ment of interest only on claims specified in kind, unsecured claims timely filed, unsecured claims untimely filed, and allowed claims for penalty, forfeiture, and the like. There is no mention of interest on distribution of residue to the debtor.[23] The debtor refers to 28 U.S.C.A. § 1961, which states that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." This section has been construed to apply to bankruptcy proceedings. *See In re Southern Indus. Banking Corp.*, 87 B.R. 518 (Bkr.E.D.Tenn.1988); *In re Goldblatt Bros., Inc.*, 61 B.R. 459 (Bkr.N.D.Ill.1986). The question then becomes whether the court's order to the trustee to pay the refund was a judgment. Grant argues that it was not. We agree. The order was not the result of an adversarial proceeding; it was a direction made as part of the bankruptcy court's supervision of the administration of the estate. Section 1961 does not require the payment of interest under these circumstances. Title 11 U.S.C.A. § 105 authorizes the bankruptcy court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [Title 11]." There are no cases which indicate, however, that section 105 has been used to allow the award of interest against the trustee. None of these statutes, therefore, authorize the award of punitive interest.

Second, an award of punitive interest against Grant violates due process principles. Grant has not been made an individual party at any point in these proceedings. Grant was not given the opportunity to defend his actions, other than to state at the fee hearing that he delayed payment on Bergwerk's advice. While "bankruptcy trustees may be held personally liable for breaches of fiduciary duty," *In re San Juan Hotel Corp.*, 847 F.2d 931, 937 (1st Cir.1988),[24] due process requires that the

---

**22.** Bergwerk argued before this Court that the refund was delayed because the refund order was erroneously sent to Grant and not to Bergwerk. He claims that Grant thought Bergwerk was handling the matter, and therefore did not act on it.

**23.** *In re General Coffee Corp.*, 85 B.R. 905 (Bkr.S.D.Fla.1988), contrary to Grant's assertions, did not consider the issue of interest on a delayed refund of residue.

**24.** It is not necessary to prove that the estate was harmed in order to prove a claim of breach

debtor should seek to impose this liability through a separate, adversarial proceeding where Grant will have notice and an opportunity to defend himself.

It is possible, however, that the award of interest was not a punitive measure. Grant invested the refund money in Certificates of Deposit ("CDs"). During the four years since the resolution of this case, the CDs have been generating interest. Because the refund belongs to the debtor, the interest generated by the CDs also belongs to the debtor. Bankruptcy II may have intended simply to order the return to the debtor of the refund and to award to the debtor the interest generated by the CDs. Award of the generated interest to the debtor is the only correct disposition of that accrued income. As much of the $65,-116.76 as was generated as interest on the CDs, therefore, rightfully belongs to the debtor, and award of that interest is not invalid.

### D. *Summary*

The actual administration of this bankruptcy estate was concluded in December 1985. In the four years since that time, the activity in the case has consisted of various appeals and cross-appeals of the attorney's fee awards and litigation regarding the trustee's refusal to pay the refund. A fairly simple involuntary bankruptcy case, therefore, has dragged on for seven years when it could have been resolved in two and a half. The reason for this appalling waste of time and resources is a breakdown in the chain of responsibility established from the district court through the bankruptcy court to the trustee and his attorney.

The trustee and his representatives are officers of the court. Their fiduciary duty is to administer the estate. *In re J.M. Wells, Inc.*, 575 F.2d 329, 331 (1st Cir.1978). They must be totally objective, and must never perform as self-serving parties. *In re Redman*, 69 B.R. 27, 29 (Bkr.D.Hawaii 1986). Under no circumstances may a trustee or the trustee's attorney "obtain excessive fees that unreasonably diminish of fiduciary duty. *San Juan Hotel*, 847 F.2d at 937.

the estate." *J.M. Wells*, 575 F.2d at 331. To ensure that such an egregious breach of fiduciary duty does not occur, the Bankruptcy Code requires bankruptcy courts to approve the trustee's compensation and authorizes a bankruptcy judge to remove a trustee for cause. *Weissman v. Hassett*, 47 B.R. 462, 467 (S.D.N.Y.1985) (citing 11 U.S.C.A. § 107(b)(2) and 11 U.S.C.A. § 324). *See also Matter of State Financial Service, Inc.*, 432 F.Supp. 129, 131 (M.D.La.), *aff'd sub nom. State Financial Service, Inc. v. Collector of Revenue*, 565 F.2d 161 (5th Cir.1977) (bankruptcy court's duties include supervising trustees "in their efforts on behalf of the estate and creditors"). Likewise, to ensure that a bankruptcy judge does not abuse his or her discretion in such matters, the district court is available to review the bankruptcy court's actions.

In the present case, one or all of these safeguards broke down. Bankruptcy I allowed Grant to hire an attorney to protect Grant's legal interests. That attorney apparently took over the case and proceeded to amass a $414,000 estate, the large majority of which was unnecessary, so that he could later claim attorney's fees in the hundreds of thousands of dollars. The estate was administered four years ago, yet the parties continue to tie up judicial time and resources. All of these abuses should have been stopped long before the dispute reached this Court. Bankruptcy court judges have a judicial responsibility to closely monitor the administration of a bankruptcy estate, and particularly to prevent abuses by trustees and their attorneys. The district court in turn must oversee the bankruptcy court to insure that a misadministration of a bankruptcy estate, such as occurred in this case, does not happen. The kind of behavior engaged in by Bergwerk and Grant and allowed by both of the bankruptcy courts and the district court will not be allowed to continue; such maladministration not only gives the impression that the administration of a bankruptcy estate is a circus, but it is also too costly for the courts and the taxpayers.

### III. CONCLUSION

We hereby AFFIRM the district court's affirmance of the bankruptcy court's fee award to Bergwerk. We DENY Bergwerk's application for fees generated on the district court appeal and this appeal. We DENY the debtor's motion for award of attorney's fees incurred in this appeal. We REMAND to the district court for the appropriate actions necessary to ensure that the trustee pays the $275,088.96 refund to the debtor, along with only the portion of the $65,116.76 award of interest generated as interest on the CDs, and closes out this proceeding.